Commonwealth *v.* Stotland, Appellant.

Argued September 13, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Bernard L. Segal,* with him *Robert J. Sugarman, Charles H. Baron, Paul Bender, Benjamin Lerner, Thomas J. McBride* and *David Rudovsky,* for appellants.

*Paul R. Michel,* Assistant District Attorney, with him *James D. Crawford,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth.

*Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, with him *Frank J. Pfizenmayer,* Assistant City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for Commonwealth.

OPINION PER CURIAM, March 20, 1969:
Judgments of sentence affirmed.

---

CONCURRING OPINION BY SPAULDING, J.:

Appellants in these cases were convicted in summary proceedings of violating the terms of an emergency proclamation issued April 5, 1968, by the Mayor of Philadelphia under Philadelphia Ordinance 10-819. Appellants appealed to the Court of Quarter Sessions of Philadelphia County which affirmed the convictions after a trial de novo. Appellants now appeal from the affirmance of their convictions.

Ordinance 10-819 authorizes the Mayor of Philadelphia to declare a State of Emergency within the City and to impose certain extraordinary measures to maintain public order for the duration of the emergency period.[1] On April 5, 1968, Mayor James H. J. Tate is-

---

[1] The portion of Ordinance 10-819 which is relevant to these appeals provides:

"§10-819 STATE OF EMERGENCY

"(1) Emergency Measures. The Mayor of the City of Philadelphia is authorized, if he finds that the City or any part thereof is suffering, or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens, to declare a STATE OF EMERGENCY and take the following specified

sued a Proclamation declaring a State of Emergency and invoking some of the emergency powers authorized by the ordinance.[2] The convictions in all of these appeals result from violation of the Proclamation's prohibition of public gatherings in groups of 12 or more individuals.

The Proclamation was issued the day following the assassination of Dr. Martin Luther King. In the wake of Dr. King's death, rioting, arson and looting erupted in several major cities throughout the nation. While no widespread rioting gripped Philadelphia in the 24 hours following the murder, there was a substantial

---

measures throughout the City or any part thereof: (a) Prohibit or limit the number of persons who may gather or congregate upon the public highways or public sidewalks or in any outdoor place, except persons who are awaiting transportation, engaging in recreational activities at a usual and customary place, or peaceably entering or leaving a building . . . ."

[2] The Proclamation was in effect from 9:00 p.m., April 5, 1968, until 6:00 a.m., April 10, 1968, and provided in part:

"WHEREAS, Widespread public disorder has erupted in cities throughout the nation, resulting in numerous deaths, personal injuries and extensive damage to property; and

"WHEREAS, There exists a threat of public disorder in the City of Philadelphia, particularly as a result of meetings and gatherings in public places; and

"WHEREAS, The City has made and continues to make substantial efforts to prevent disorder, but it is deemed that the threat to the City warrants additional action to protect the health, safety, and property of the citizens of Philadelphia,

"Now, This Fifth day of April, 1968, pursuant to the powers vested in me under Section 4-100 of the Philadelphia Home Rule Charter, and Chapter 10-800 of the Philadelphia Code, I hereby declare a limited State of Emergency in the City of Philadelphia.

"All persons in groups of twelve (12) or more are hereby prohibited from gathering or congregating upon public highways or public sidewalks, or in any other outdoor place, except persons who are awaiting transportation, engaging in recreational activities at a usual and customary place, or peaceably entering or leaving buildings."

increase in the number of incidents symptomatic of impending riots. The Proclamation was issued as a preventive measure.

Appellant Countryman was arrested in Roosevelt Park in South Philadelphia on April 6, 1968. Countryman and 49 other individuals gathered in the park to hold a tree-planting ceremony under the auspices of the Philadelphia Committee for Non-Violent Action to protest the recommissioning of the Battleship New Jersey. The protest was peaceful at all times and there was no clash between demonstrators and others using the park. The demonstration was conducted under a permit issued by the Fairmount Park Commission and no participant violated any law other than the Proclamation. No participant was arrested until the Proclamation was read and an order by police to disperse was disobeyed.

Appellant Achtenberg was arrested on April 7 in front of the residence of Congressman William A. Barrett in Philadelphia. Appellant and 11 other members of the People for Human Rights organization gathered at Congressman Barrett's home to petition for passage of civil rights legislation proposed by Dr. King. Members of the protesting group began assembling in front of Barrett's home about 2:00 p.m. For one hour thereafter the group consisted of less than 12 individuals and hence was not in violation of the Proclamation. During this period, the group was twice approached by a hostile spectator who urged the protestors to leave. However, there were no incidents. The demonstration was entirely peaceful and the demonstrators violated no law other than the Proclamation. Shortly after the twelfth member of the group arrived the Proclamation was read and appellant was arrested for refusing to obey an order to disperse.

Appellant Stotland was arrested on April 8, 1968, on the campus of the University of Pennsylvania while

a member of a gathering of 250 people demonstrating against the Proclamation. The demonstration consisted of several speeches both for and against the Proclamation. Again, the meeting was entirely peaceful and there was no disruptive or disorderly conduct. The Proclamation was read by police to the assembled crowd and appellant and others who refused to disperse were arrested.

The fundamental claim raised in these appeals is that Ordinance 10-819 and the Proclamation of April 5 unconstitutionally abridge the rights of free speech and assembly by imposing a prohibition upon purely peaceful assemblies. In my view, the resolution of this question turns upon the interpretation given the ordinance. While I agree with the holding of the majority that the ordinance is a constitutionally valid exercise of State police power delegated to Philadelphia by the Home Rule Charter, I do so only because of the limitation which I understand the ordinance to impose upon the exercise of the emergency powers.

## The Constitutionality of the Ordinance

The question posed relates to the power of the State to impose time, size and area limitations upon peaceful public assemblies. A State may under its police powers regulate these aspects of assembly although the conduct which is the subject of regulation is intertwined with expression and association. *Cox v. Louisiana*, 379 U.S. 559 (1965). The focus of inquiry in these appeals is upon whether the conditions necessary for the exercise of this power are present.

The time, place and manner of speech and assembly may constitutionally be regulated by a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct should be

limited or proscribed. *Edwards v. South Carolina,* 372 U.S. 229 (1963). The regulation must rest upon the legislative judgment that the conduct which is the subject of regulation or prohibition would endanger an interest which the State may legitimately protect from interference, and the means employed must relate to the protection of the interest involved. *Cox v. Louisiana, supra.* Finally, the statute must limit administrative discretion to considerations of public interest in the enforcement of the statute. *Cox v. Louisiana, supra; Cox v. New Hampshire,* 312 U.S. 569 (1941).[3] When these conditions have been met, the State may restrict the time, place and manner in which speech is communicated.

Turning to the case at hand, it is necessary to determine whether Ordinance 10-819 satisfies the conditions for constitutional regulation of the time, place and manner of public assembly. It is important to note that the ordinance does not undertake to regulate the content of speech. There are no limitations affect-

---

[3] Cases holding exercises of state power limiting the time, place or manner of public speech or assembly unconstitutional have rested upon findings that some or all of these conditions have not been met. Attempted regulations have been struck down where they were not based upon narrow statutes regulating specific conduct, *Edwards v. South Carolina, supra; Cox v. Louisiana,* 379 U.S. 536 (1965); *Saia v. New York,* 334 U.S. 558 (1948); where the restriction constituted a prior restraint upon the content of speech, *Lovell v. Griffin,* 303 U.S. 444 (1938); *Cantwell v. Connecticut,* 310 U.S. 296 (1940); where the statute vested power in administrative officials to exercise advance control over the content of speech or to regulate on the basis of standards not related to protection of the public interest, *Largent v. Texas,* 318 U.S. 418 (1943); *Niemotko v. Maryland,* 340 U.S. 268 (1951); *Kunz v. New York,* 340 U.S. 290 (1951); or, where the conduct prohibited did not interfere with the proper functioning of interests which the state could legitimately protect, *Thornhill v. Alabama,* 310 U.S. 88 (1940).

ing the sponsorship, purpose, hours or duration of assemblies.[4] The prohibition is effective only in the geographic areas of the city in which a State of Emergency has been declared. The prohibition is effective for a maximum period of two weeks. No limitation of any kind is imposed upon indoor assemblies.

The ordinance specifies that the emergency powers may be invoked only if the city "is suffering, or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens . . . ." The alternative conditions that the city be "suffering" or be "in imminent danger of suffering" a riot indicate that the emergency powers may be employed as a preventive measure as well as a control device. As the Commonwealth suggests in its brief, the words "imminent danger" have the same meaning as "clear and present danger."

Both the ordinance and its history indicate that the only danger defined by the language "civil disturbance, disorder, riot or other occurrence" is a large scale urban riot. In 1964, a large scale riot occurring in Philadelphia resulted in scores of injuries and extensive property damage. During the summer of 1967, only one month prior to the enactment of Ordinance 10-819, the prospect of an impending riot of these proportions prompted the Mayor of Philadelphia to make an executive decree similar to the Proclamation of April 5 without legislative authorization. The ordinance was enacted to give the Mayor more effective power to restore

---

[4] Section (e) of the ordinance, which permits the Mayor to impose a curfew during emergency periods, would affect the permissible hours of assembly in that a general curfew would have the effect of prohibiting all night-time outdoor assemblies. The constitutionality of this section of the ordinance is not at issue in this case.

order or prevent disorder in future outbreaks of this kind.

The language of the ordinance supports the conclusion that the powers may be exercised only to control or avert a large scale riot. The eight specific measures which the Mayor is authorized to apply are uniquely designed to combat this catastrophic form of civil disorder. The powers to restrict surface and air transportation into and within the city are aimed at containing a riot within existing riot-struck areas. The prohibitions upon the sale of weapons and inflammable liquids are designed to restrict or prevent arson and violence by limiting the availability of articles which might be employed to these ends. Restrictions imposed on the sale of alcoholic beverages may prevent the further aggravation and release of inflamed passions and hostilities. The powers to limit public assembly and to impose a curfew provide readily enforceable crowd control devices during an existing riot and limit the opportunities for the public venting of emotions which, when there is a clear and present danger of riot, may turn the possibility of riot into reality.

A large scale urban riot involving widespread arson, looting, vandalism and sniping is the most destructive form of civil disturbance. The magnitude of the rioting which has occurred in major cities in recent years is measured in scores of deaths, hundreds of injuries, and millions of dollars of property damage.[5] In many instances, city and state executives have been required to employ State National Guard or United States Army troops to restore order to the community.[6]

Experience has demonstrated that a large scale riot may not be susceptible to control by the ordinary law

---

[5] See generally, The National Advisory Commission on Civil Disorders, *Report*, 109-201 (Bantam Ed., 1968).

[6] *Id.* at 112, 113, 497-509.

enforcement techniques involving enforcement of criminal statutes providing for the punishment of individual violent acts after the violence has occurred. The National Advisory Commission on Civil Disorders has recommended that cities enact ordinances containing grants of emergency powers similar to those contained in Ordinance 10-819.[7] The number and mobility of rioters require enforcement techniques aimed at containing or averting outbreaks of violence through crowd control measures readily understood by inhabitants of riot areas and easily applied by enforcement officers.

In ordinary times and at ordinary places, large public assemblies, especially for the purpose of peacefully communicating controversial ideas and minority viewpoints, must be given the greatest possible protection. However, in the highly charged atmosphere prevailing when the danger of a large scale riot is present, large public assemblies, although peaceful to all appearances, may inflame passions or promote clashes between persons or groups with divergent views and ignite the violence which may quickly become a full scale riot. The purpose of the limitation upon assembly is to eliminate the possibility of these dangerous confrontations at times and places where there is a clear and present danger of a large scale riot. The effect of the limitation is merely to delay assemblies until they can be held without endangering the entire community.

I therefore would construe Ordinance 10-819 as authorizing the Mayor to declare a State of Emergency only after he has found that there is a clear and present danger of a large scale civil disorder and granting him the power to limit public assembly only if the limitation is necessary to avert the danger and only

---

[7] *Id.* at 522-27.

in those geographic areas where it is needed for the success of the preventive action.[8]

As so construed, I believe the ordinance to be constitutional. The limitations imposed upon assembly by Ordinance 10-819 are attained through a legislative directive that specific conduct be restricted because that conduct threatens an interest which may legitimately be protected by the state. Maintaining peace and public order is the most fundamental duty of government and is the primary justification for the existence of State police power. "The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." *Cox v. Louisiana*, 379 U.S. at 554. Where "riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious . . . ." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). City Council was not unreasonable in its conclusion that under the limited conditions within which the ordinance permits regulation of assembly, public assembly dangerously interferes with this interest.

In many respects, this case closely resembles *Cox v. Louisiana, supra*. In *Cox*, a State statute *prohibiting all demonstrations* at or near a courthouse was held constitutional upon a finding that the prohibited

---

[8] The geographic scope of the emergency powers does not need to be limited to those portions of the city in which the danger of riot is present. If the powers are exercised in a limited area only, they may serve to aggravate tension further. Manpower needs and other administrative considerations may require that the powers be exercised in an area broader than that actually threatened with violence in order to avoid the risk of seriously jeopardizing the preventive action. See, Note, *Judicial Control of the Riot Curfew*, 77 Yale L.J. 1560, 1572-3 (1968).

conduct would seriously jeopardize the effective administration of justice. The significance of *Cox* is that the Supreme Court upheld an absolute ban upon all demonstrations whether or not peaceful, within a limited geographic area because of the finding that within that area even peaceful demonstrations inherently threatened an interest which the State had a right and duty to protect.

In the instant case, an ordinance permits a ban upon all demonstrations for a limited time period (a maximum of two weeks) because of a determination that all demonstrations during this period threaten an interest which the State has a right and duty to protect. In both *Cox* and the present case, the regulation was the product of a legislative judgment indicating that specific conduct—public assembly, peaceful or otherwise—when engaged in under certain definite, narrowly defined circumstances, threatened the public safety and welfare. In *Cox*, the conduct was deemed to pose a danger because it occurred at a certain *place*, at or near a courthouse. In this case, the conduct was deemed to pose a danger because it occurred at a certain *time*, when there was a clear and present danger of a large riot. A narrow temporal limitation upon assembly is no less constitutional than a narrow geographic limitation.

### Legality of the Proclamation

A statute or ordinance imposing regulations upon speech-related conduct must limit administrative discretion in enforcement to consideration of the standards of public interest determined by the legislature. See, *Cox v. Louisiana, supra*; *Cox v. New Hampshire, supra*; *Largent v. Texas, supra*; *Niemotko v. Maryland, supra*. The ordinance meets this constitutional

requirement. It imposes strong limitations relating directly to protection of public order upon the power to limit outdoor assemblies. Gatherings may be limited only during a State of Emergency. Such a State may be declared only if the city is faced with a clear and present danger of riot. Moreover, the power to limit assembly may be exercised only when its use is necessary to avert the danger and only in those geographic areas where it is needed for success of the preventive action.

The ordinance's limitation upon the exercise of administrative discretion is embodied in the requirement that the powers may be exercised only if the Mayor makes factual findings that the conditions necessary for the use of the powers are present. Although the language of the ordinance is somewhat ambiguous, in my judgment it requires these findings to be communicated to the public. The powers granted to the Mayor are drastic and in the ordinance City Council imposed an important barrier to arbitrary and unjustified exercise of the powers in limiting their use to periods when the Mayor was able to make specific findings that the danger existed.

This barrier can be effective only if the basis for the findings is articulated. Because the decision to act rests solely with the Mayor, if the basis for his action is undisclosed, his discretion is in effect unbridled. Moreover, if he is not required to account publicly for use of the emergency powers there may be few means of determining whether, in particular cases, the exercise of discretion was in fact based upon the legislative standards. Judicial review rests largely upon a determination of whether mayoral discretion was abused. This review cannot be effective if the basis for administrative action is undisclosed.

In ascertaining the intention of City Council we are guided by the presumption that it intended to act con-

stitutionally. As executive discretion can be effectively limited to application of the standards imposed by City Council only if the basis for action is disclosed, the ambiguity in the ordinance must be resolved by holding that on-the-record findings are a prerequisite for use of the emergency powers.

The only on-the-record findings in the case at bar are contained in the preamble to the April 5 Proclamation.[9] Although the preamble does state that a "threat of public disorder" existed, there are no specific factual findings regarding existing conditions in the city which would justify this general conclusion. Moreover, there are no findings whatever regarding the geographic scope of the emergency or the necessity of applying the limitation upon public assembly throughout the entire city. The "findings" of the preamble are stated so broadly as to permit its use on any occasion the ordinance might be called into service. With these defects, the preamble does not meet the requirements of the ordinance. To meet these requirements, the findings must be specific and provide the factual basis upon which the decisions relating to declaration of a State of Emergency, choice of emergency powers and the geographic scope of their exercise are made.

However, the court below found that the conditions justifying exercise of the emergency powers on a city-wide basis existed on April 5 and that *the Mayor actually made, although he did not record,* the requisite findings to this effect. The court's findings in this regard are amply supported by the record, which shows with unmistakable clarity that the danger of a large scale riot was great and that the Mayor's discretion was judiciously exercised and based upon the sole consideration of implementing on a limited basis those

[9] See note 2, *supra.*

emergency powers which would assist in averting the crisis facing the city.

The sole purpose of City Council's requirement that the Mayor's findings be placed on the record is to insure that the decision to prohibit assembly is founded upon the standards of the ordinance. The record demonstrates that the Mayor did in fact exercise his discretion in complete conformity with these standards. In so doing, the Mayor fulfilled the constitutional requirement of executive adherence to legislative restrictions and obeyed the substantive limitations on his power set by City Council. The assassination of Dr. King provoked a national crisis with rioting in all parts of the country. Events in Philadelphia confirmed the likelihood that a riot was imminent. The situation on April 5, 1968, was unique in the history of the nation and the scope and imminency of the danger was known to the Mayor and the public alike. Under the limited circumstances of this case, the deficiencies in the content of the on-the-record findings constitute a harmless procedural error which does not mandate a holding that the Proclamation was not lawfully declared.

I therefore concur in affirming the convictions.

HOFFMAN, J., joins in this opinion.