## Defender Association of Philadelphia Amendments of Articles of Incorporation.

Argued September 21, 1970. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Louis B. Schwartz,* with him *Bernard L. Segal* and *Dennis Eisman,* for appellants.

*Edward W. Madeira, Jr.,* with him *Vincent J. Ziccardi,* for Defender Association of Philadelphia, appellee.

*Judah I. Labovitz, Thomas Gilhool* and *Thomas B. Harvey, Jr.,* for American Civil Liberties Union, intervenor.

OPINION PER CURIAM, June 30, 1971:
Order affirmed.

---

DISSENTING OPINION BY SPAULDING, J.:
I respectfully dissent.

Appellants, members of the Defender Association of Philadelphia, and previous members of its Board, challenge the approval of certain amendments to the Association's charter by the Court of Common Pleas of Philadelphia.

I

The Defender Association of Philadelphia traditionally has been a "private" group engaged in the defense of indigents accused of crimes. Prior to March 1969, the Association had been operated by a fifty-man Board of Directors elected by the dues-paying membership. Its financing came from various sources, including the United Fund of Philadelphia. When *Gideon v. Wainwright,* 372 U.S. 335 (1963), established that local governments were constitutionally required to provide funds for the defense of indigents accused of crime, the City began to supplement the Association's income.

When it became apparent, in January 1969, that a contribution of $1,250,000 would be necessary, the City Administration determined that it would assume control of the Defender operation. However, a proposed ordinance (Bill 830) establishing a public defender office, with the Defender to be appointed by the Mayor, caused considerable public indignation. As a compromise, the Association-City contract was reached. Under this contract, the City would not create a new organization, but would provide the necessary operational funds for the Defender Association, which, in return, would amend its charter to restructure the Board of Directors: ten directors would be chosen by the City, ten by the Association, and ten by the combined group of twenty.

The Association's existing Board approved this arrangement by a 19-16 vote. On March 28, 1969, the Association (proponents) submitted to the Court of Common Pleas a series of amendments which made the following changes: (1) a phrase permitting reference of clients by charitable organizations was deleted (art. II); (2) the change in the structure of the Board of Directors was added (art. VII); (3) the article limiting yearly income receivable was deleted (art. XI). Objections were filed by appellants (objectors). Judge JOHN J. McDEVITT, III, held a hearing and approved the amendments in an "adjudication" filed on August 8, 1969.

## II

The petition to amend the Association's charter was brought pursuant to the Pennsylvania Nonprofit Corporation Act, 15 P.S. 7707, which provides that the court shall approve charter amendments if they are "lawful" . . . beneficial and not injurious to the community". The lower court, after a lengthy summary of the respective arguments, stated that "[it] cannot accept

the arguments that the revised Charter would create a corporate monster outside the contemplation of the Nonprofit Corporation Law which is clearly unlawful, not beneficial and would be injurious to the community. . . ." The court concluded by saying: "We do not decide the problem before the Court on the basis that the contract with the City requiring an amendment of Articles of Incorporation represent [sic] the better choice of two evils. Actually in our opinion the Defender Association service to the community will be more beneficial than in the past. Believing that the Board of Directors will be 'independent' the Association *will now be adequately financed and in a position to meet the increasing demand for legal representation as required by the Constitution and court decisions."* (Emphasis added.)

Section 7707 of the Nonprofit Corporation Act states a requirement for a positive finding that amendments be "beneficial", as well as the determination that they are "not injurious". This wording does not indicate a balancing of benefits and detriments but required a finding of positive benefit. The term "beneficial" does not appear in the analogous provision for amending a corporation charter under the Business Corporation Law. 15 P.S. §§1801-1810. The Legislature evidently intended that in the case of nonprofit corporations, the charter should not be amended unless the amendment improved the organization's service to the community. At the very least, the term must require a finding that the amendment is for the community good.[1]

---

[1] While a new optional provision of §7707 permits filing of amendments to the charter of a nonprofit corporation without court approval, that is not determinative of the proper decision for the court in this case. Further, the new provision does not overrule the present section, and it is not at all clear what effect it will have on the substantive standards enunciated for amending the charter.

In my view, the findings of the court below do not meet the requirements of §7707. Of the amendments, the court states only that they would not "create a corporate monster" which is "clearly unlawful" or "not beneficial" or "injurious to the community". It appears that what the court found beneficial was not the amendments themselves, but the total contractual arrangement. It is undeniable that an increase in funds is beneficial to the Association, but that does not meet the question whether the structural change is in fact beneficial to the community. Since the merits of the contractual arrangement were beyond the scope of the amendment hearing below, the decision on the validity of the amendments should have been made without reference to the underlying contract.

## III

On the issue of the propriety of the amendments themselves, the court below states that the burden of proof falls upon the proponent Defender Association, and that this burden was met. However, a review of the four volumes of notes of testimony clearly substantiates objectors' contentions that the amendments were neither "beneficial" nor "non-injurious to the community". Rather, the testimony of both parties indicates (1) no showing that the proposed structure was necessary for accomplishing any beneficial purpose; and (2) a net loss of benefit amounting to "injuriousness". In no sense does the testimony warrant the conclusion that the Association did in fact meet its burden of proof.

Testimony on the need for the proposed structure, or the purpose it was to serve, was at best inconclusive. Although the circumstances suggest that the City's intention was to acquire virtual control over the Associa-

tion's policy,[2] the proponents never explicitly stated that this was the purpose of the amendments. Their position seemed to be that the increased membership on the Board was only the indirect result of the City's need to oversee the use of its financial contribution. In fact, however, their evidence made no showing that such extensive representation was needed.

The Court Administrator, Edward J. Blake, Esquire, testified for the proponents that there was a financial interest involved. (Blake, R. 27, 30, 40.) But he also conceded that the Association had never been charged with financial mismanagement or inefficiency (R. 47), and that the existing procedure through which his own office channeled funds to the Association was neither inefficient nor a burden upon that office. (R. 39.)

The objectors' testimony showed that existing safeguards and standard corrective procedures used by the City, were more than adequate to protect its interest in fiscal supervision of the increased funds.

District Attorney Arlen Specter testified: "I think that there are ways that the City can check on the expenditures in a proper way to see to it that their interests are taken into account; that there not be waste. For example, in my office I have very substantial restraints which are imposed under the law, and I think it could be applied to the Defender, in terms of every appointment that I make has to be approved by personnel and by finance, and there are classifications of expenditures, Class 100, 200, 300 and 400, without getting into details, and I would say that they are very onerous and that they are unduly restrictive, but certainly I think it could not be said that they are not restrictive enough. And I could illustrate it in a nut shell by the recent experience I have had in seeking to

_____

[2] I find that such control would create an unconstitutional conflict of interest. See part IV, infra.

raise the salaries of my Assistant District Attorneys, where I concluded that I had a clear cut right to do so and even though I am an independently elected official who is not answerable to the Mayor or the City Council, only to the voters, and even though I had a very strong charter for authority for what I was to do, the mechanism of City Government, the Finance Department, was able through its own restraining influence, which would exist to anybody the City pays, to hold up that money for a protracted period of time. The matter was litigated before Judge Bradley, who upheld it and it was in the Supreme Court before the City abandoned their position. So that there are ample safeguards which would exist through normal City procedures to see to it that there are appropriate expenditures, to say nothing of the Controller's Office. . . ."

Former Councilman David E. Cohen testified: ". . . I don't see the need for this. I have been going through public budget hearings and Democratic caucus which involved the contemplated expenditure in the next year of much more money than I can begin to even grasp, have any knowledge of what it means—something like three quarters of a billion to a billion dollars. The money in a number of instances passes through other organizations, in some instances they are outright donations. The City has representation. I am a member of the Pennsylvania Academy of Fine Arts at the Board of Directors representing the City, but I sit as one member of the Board of Directors of some 25 or 30. I go over carefully all of the financial statements and the minutes of the meetings, but we don't have any kind of representation which gives the City the sense of realistic control. At the same time, I feel my responsibility deeply with respect to whatever contribution of City monies is involved, to see that they are expended in the best possible way. . . . I don't know why the City ought not to have some members on the

316

Board of Directors, either voting or ex officio, who make it their business—as most of the City Council representatives do now who are assigned to membership on the Board of Directors, who make it their business to keep abreast, to raise with other Councilmen, to raise with the organization, any questions they have with respect to policy. Then, in addition, the City has the full opportunity each year to subject at public hearings the officers of these organizations to whom the City is contracting money, to raise any question of policy as to what the organization does and how it utilizes City funds. So it seems to me that we already have established traditionally a very fine mechanism that could work here and could at the same time move in the direction of achieving the maximum possible independent kind of representation consistent with some basic safeguarding of the City's interests in the large sums of money to be invested here." (R. 609-612.)

Former Councilman Henry Sawyer also presented extensive testimony showing that the City's usual treatment of "purchase of service contracts" did not involve anywhere near the amount of representation demanded here. (R. 509-510.)

As to the injurious nature and undesirability of the new arrangements, the objectors presented striking testimony which was not in any way contradicted by the proponents. As well as District Attorney Specter, former Councilmen Cohen and Sawyer, cited above, the objectors' witnesses included such disparate public figures as First Assistant District Attorney Richard Sprague, Professor Norman Dorsen of the New York University School of Law and Martin Vinikoor (the former Chief Defender whose resignation the City made a condition precedent to contractual negotiations).

The following testimony was particularly pertinent: Former *Councilman Cohen*: "I think that the kind of

influence that City government should have, naming half of all those that are being named—that is the 10 by the City as against the other 10 and, as I understand, that those 20 naming the third set of 10, whom I would assume would at least half represent the City and perhaps half represent whatever interests there are, it seems to me that that degree of control destroys the whole concept of independent representation. . . . I think it places someone under the great strain and I think it denies the defendant the kind of independent representation he ought to have in the form of a lawyer who is completely fearless at the Bar and dedicated within the limits of legal ethics to a zealous, outspoken, forward defense of his client." *District Attorney Specter* "Q. Just rephrasing the question, considering the proposed structure of the Defender Board with the role of the City as I have just indicated to you, being one third of the members appointed by the Mayor and that one-third having a chair in the decision as to another third, do you consider that to be a desirable arrangement with regard to the influence or power of the City of Philadelphia, vis-a-vis the Defender Association? A. I think that arrangement is undesirable . . . A. Well, Judge McDevitt, I think that a Defender Association should operate to give independent representation to those who must have representation at public expense. I think it should be totally non-political. I think it should be operated with a view to merit selection of Assistants, with a view to an efficent operation and with a view to a professional operation without any outside strains to regulate it in any way. . . . What I have seen of organizations which have governmental strains and which are subject to the regulation of the Mayor's office and the City Council, to put it directly, it has not fulfilled that criterion. Q. In regard to one of your standards, that it be an independent form of representation, what is the danger, if any, that you see in having

Assistant Defenders who may be appointed either through political influence or appointed because of political approval of their selection has been involved? A. Well, the problem that I see is that if you have political control over the Defender's Office, so that somebody in a high position can dictate who is going to get the job, then you do not get the best man to start with; you do not have the ability of his supervisor to regulate his work in terms of his hours, in terms of the absence of a private practice, which I think is indispensable to run an office of this sort; you do not have unfettered discretion on his part, because he has allegiance to those who have employed him; and you do not have the unfettered ability of the man in charge to see to it that he does his job. . . . Because if there are political appointing powers and there are political factors, they lurk in the background and have no place in either the prosecution or defense of criminal cases. . . . Q. Based upon your experiences with municipal governments, in a sense a municipal official and dealing with a municipal official, do you know of any legitimate City of Philadelphia interest that requires the City of Philadelphia to take the share of control of the Defender Association that this proposed contract and these proposed amendments set forth? A. . . . I think that the proposal gives too much control to the City in terms of the nature of legitimate concern and the proven ability of the Defender Association to operate. . . ." *Assistant District Attorney Sprague* "Q. Now, from the standpoint of having been at one time a Defense Counsel and now being a Prosecutor, being aware of what some of the problems that the Defense Counsel faced, do you believe that the measure of City involvement in the operation of the Defender Association as now proposed by these amended articles would possibly have or in fact have some effect on the judgment or independent judgment of Assistant Defenders trying

cases? A. I think it could. The basis of my answer is that again I'm aware of the extent to which, say, the Police Department, people from the City Administration, are interested in—from the Prosecutor's side, we call it the war on crime. And to the extent that the Police, through whatever levels of people in the Administration could perhaps have a say over policies by those defending people we're warring on, and there in my opinion will be a reaching into that area and intimidation getting people to back off certain action that they might otherwise take, and I think and I feel that the people employed unfortunately are not always the most resolute and if they're aware of the powers over them, they might not take as forthright a stand as they otherwise would if they were completely independent."

Further, it is noteworthy, that proponents' witnesses did not refute any of the above testimony. In fact, they must be taken as further substantiating objectors' contentions. Thus, Edward J. Blake, Esquire, testified: "Q. Are you aware that the City of Philadelphia through the City Solicitor's Office has asserted and that there has been an opinion in the Court of Common Pleas of Philadelphia that the City may prosecute violations of the Mayor's ordinance—the Mayor's emergency ordinance powers as well as the District Attorney may prosecute those particular criminal actions? Are you aware of that, sir? A. Well, I'm certainly aware of it, yes. Q. And are you aware, therefore, that the City Solicitor could very well be appearing in cases where indigent defendants charged with violation of the Mayor's proclamations are represented by the Defender Association? A. Yes, indeed. Q. Do you not see some conflicts of interest where the Defender Association Board is appointed one half by the Mayor with the approval of Council and the prosecutor in those cases, the City Solicitor, is appointed by the Mayor with the approval of City Council, and the Po-

lice Commissioner, whose officers are the arresting officers, is appointed by the Mayor also? A. No. I believe that the *remainder of the Board, being appointed by some officers other than the Executive, would give an independent character to the Association.*" (R. 56-58.) (Emphasis added.) . . .

Other testimony presented by the proponents is also revealing. The testimony of Pace Reich, Esquire, an Assistant City Solicitor, and Herman Pollock, a former Chief Defender, follows:

Pace Reich testified: "Q. Isn't the reason, as a matter of fact, each and everyone of the corporations that you picked off yesterday, Port Development, Industrial Development, Food Distribution Center, Housing Development Corporation, were set up in the particular manner they were set up to enable the City to have more flexibility in dealing with these areas than the City would have under the charter provisions which in many areas would make it difficult to negotiate contracts and agreements? A. I think that's a major consideration. I don't think I'm capable of going into all the considerations, since many of those were set up by the other persons and I did not—was not involved in it. I was involved in the setting up of both Bicentennial Corporation and the Port Corporation, and while it is hard to determine what was in my mind as to why we needed the representation, *I think as a general matter I can say it's because the City had a very substantial overall interest in that particular activity, just as I conceive that they have a substantial overall interest in this activity.*" (R. 638-639.) (Emphasis added.)

Herman Pollock testified: ". . . Let me say right now that I am in agreement with a great deal that has been said with regard to the type of services that must be supplied, and as a member of the negotiating committee dealing with the City, the members of the committee and myself fought hard to see that there was the

kind of independence which would make this a viable organization and one which would be as free from control, political, judicial or economic, as we could possibly make it. We arrived at this not because it's the best system. I don't think it is at all. I would like to have the government give $1,200,000.00 to the Defender organization as it now is, just as Mr. Schwartz and Mr. Segal would. . . . Now, if you are going to get somebody there who isn't decent, if you are going to get a corrupt City government, . . ." (R. 590-591.)

None of the proponents' witnesses in any way contradicted any of the objectors' claims. Most importantly, there was no disagreement with the objectors' basic contention that the Defender must have the "freedom from political influence" emphasized throughout the American Bar Association's Standards Relating to "Providing Defense Services" (Standards drafted by a committee headed by Chief Justice BURGER, and including Chief Judge HASTIE of the Third Circuit Court and Herman Pollock).

Section 1.4 of those Standards states: "The plan should be designed to guarantee the integrity of the relationship between lawyer and client. The *plan and the lawyers* serving under it should be free from political influence and should be subject to judicial supervision only in the same manner and to the same extent as are lawyers in private practice. One means for assuring this independence, regardless of the type of system adopted, is to place the ultimate authority and responsibility for the operation of the plan in a board of trustees. . . ." (Emphasis added.)

At no time did proponents' witnesses disavow these standards which unequivocally require that "the plan" as well as the lawyers be free from political influence. Rather, these witnesses continually attempted to reconcile the proposed Defender Association charter amendments to the ABA standards by appealing to "practical-

ity". As stated above, neither "practicality" nor the desirability of adequate financing is of concern in this case.[3] The issue is whether the new structure does in fact meet the "beneficial and non-injurious" requirements of §7707. I find that it does not.

## IV

Section 7707 also requires that the proposed amendments be "lawful". The term "lawful" must be interpreted as requiring not only that no illegal corporate activity be authorized, but also that the authorized corporate activity conform to the requirements of the Constitution.

The lower court's adjudication characterizes objectors' complaint that the proposed structure creates an unconstitutional conflict of interest as merely "speculative", and states that the question of "adequacy of defense counsel including conflict of interest" can be raised case by case in collateral proceedings. It was error to treat conflict of interest as part of adequacy of counsel, since our courts have approached these matters quite differently. On adequacy of counsel, actual harm must be shown, and the standard is whether counsel's chosen course was reasonable in light of the alternatives. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A. 2d 349 (1967). This can only be determined on a case by case basis.

On conflict of interest, however, the question is not whether harm has been caused, but whether defendant's interests were represented by counsel. The very essence of *Gideon* was to make the right to representation absolute rather than dependent on a showing of actual harm. In our determinations on conflict of in-

---

[3] In oral argument before this Court, both parties stated that the City would continue to fund the Defender Association regardless of the outcome of this litigation.

terest, "The potentiality that such harm *may* result, rather than that such harm *did* result, furnishes the appropriate criterion." *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 48, 176 A. 2d 641 (1962). (Emphasis in original.) The claimant must "at least show the possibility of harm", *Commonwealth v. Wilson,* 429 Pa. 458, 240 A. 2d 498 (1968). This possibility may be shown either by the inherent inconsistency of positions represented by counsel, or by specific facts indicating that counsel favored one defendant over another. Only the second type of conflict requires a case by case factual determination.

This Court has been particularly stringent in scrutinizing representation for both inherent and specific conflict. See *Commonwealth v. Werner,* 217 Pa. Superior Ct. 49, 268 A. 2d 195 (1970) (conflict arising in failing to call a co-defendant who could exculpate appellant); *Commonwealth v. Bostick,* 215 Pa. Superior Ct. 488, 258 A. 2d 872 (1969) (conflict arising from counsel representing two co-defendants, one of whom pleaded guilty and one of whom pleaded not guilty to charges upon which they were jointly indicted); *Commonwealth v. Cullen,* 216 Pa. Superior Ct. 23, 260 A. 2d 818 (1969) (conflict of interest at sentencing); *Commonwealth v. Calvert,* 216 Pa. Superior Ct. 221, 263 A. 2d 770 (1970) (concurring and dissenting opinion by HOFFMAN, J., joined by SPAULDING and CERCONE, JJ.) (conflict arising from counsel noting Calvert's longer record in a plea for greater consideration for his co-defendant).

Here, there is an inherent conflict of interest. Proponents contend that this allegation is mere conjecture. But the testimony clearly established, again without contradiction, that the City's interests diverge sufficiently from the Association's interest in providing strong, effective representation to create, "the possibility of harm" required by *Wilson,* supra. The City's

insistence upon Mr. Vinikoor's ouster as head of the Association, is an example. There was no question that Vinikoor was eminently well qualifed for the position of Defender. Rather, opposition was based upon political reasons. Following Vinikoor's resignation, the City concluded the agreement with the Association resulting in the charter amendments described above.

Other specific public instances which indicate the erroneous nature of characterizing objectors' claims as "speculative" are: the former Police Commissioner's stated intention (June 10, 1969) to discontinue police payroll deductions for the United Fund because the Fund allegedly supported organizations which oppose the police department policies and his attack on Community Legal Service attorneys involved in police brutality cases.

Previous cases on conflict of interest have dealt with situations in which a single attorney is defending two clients at the same trial. Here the situation is even more potentially harmful. There is no assurance that the harm which may ensue will arise in a manner which even calls upon judicial supervision. As compared with the question of conflict of interest in a particular trial, here there is no transcript for the court to consider. We have no way of assessing when and to whom the harm may be done. However, the *risk* of harm that may ensue—despite the best intentions of all concerned —and which will not necessarily be subject to correction, is too great to permit the "wait-and-see" approach suggested by the lower court.

Constitutional rights cannot be placed in jeopardy by any group of individuals no matter how earnest and well-meaning they may appear to be. In *Tumey v. Ohio*, 273 U.S. 510 (1925), the Supreme Court held that a judicial officer could not constitutionally be permitted to have a pecuniary interest in the outcome of convictions rather than acquittals. The Court held that such

an interest must disqualify the judicial officer notwithstanding. ". . . the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man . . . or which might lead him not to hold the balance nice, clear and true between the state and the accused, denies the latter due process of law." (273 U.S. at 532).

The instant case presents such a danger, and it is likely to arise in situations of which our courts could not be cognizant. Numerous decisions are made involving the manner and method of representation which would necessarily entail additional expense for the community: notably, refusal to plead guilty, demand for jury trials, and diligent prosecution of appeals. The City's representatives would be forced to take budgetary matters into consideration when reaching decisions of this type.

Further, there are political questions that inevitably arise in planning the overall representation of indigent defendants. Conscientious defense would require strong attacks on certain official policies (e.g., courtroom practices, probation services and the adequacy of pre-trial detention facilities.) For example, the problem of the unbearable summer heat on the 7th floor of City Hall was only resolved by the Association's "threat" to demand more jury trials for its clients. It is not conjecture to state that the City's representatives would attempt to minimize such tactics whenever a sufficient threat to their policies is presented. The potential for harm through conflict of interest is so great, that the present structure should not be allowed to stand.

## V

Since *Gideon,* supra, the courts have attempted to insure *effective* assistance of counsel by imposing addi-

tional safeguards. *Commonwealth v. Baker,* 429 Pa. 209, 239 A. 2d 201 (1968); *Commonwealth ex rel. Washington v. Maroney,* supra; *Commonwealth v. Wilson,* supra. Although these efforts have been geared directly to the particular attorney-client relationship presented in each situation, the constitutional standard enunciated by the Federal and Pennsylvania courts must be applied to the organization assuming the obligations of providing counsel. The Defender Association exists solely to provide the effective, independent counsel mandated by the above decisions. We cannot allow the City to severely restrict that very independence and effectiveness by placing an unjustifiable condition upon its financing of that organization. That this condition is in fact arbitrary is amply supported by the testimony showing that the City's legitimate financial interest is adequately provided for by other means.

I would reverse the order of the lower court and **remand the case with** instructions to determine the extent of City representation consistent with its legitimate fiscal and auditing role.

HOFFMAN, J., joins in this dissenting opinion.