# Defender Association of Philadelphia Amendment of Articles of Incorporation.

Argued January 18, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Bernard L. Segal,* with him *Louis B. Schwartz,* for appellants.

*Edward W. Madeira, Jr.,* for appellee.

*Gilbert M. Cantor,* for amicus curiae.

OPINION BY MR. JUSTICE POMEROY, July 2, 1973:

We are presented by this appeal with the question whether the work of the Defender Association of Philadelphia in affording legal representation to indigent persons accused of crime will be compromised and rendered constitutionally ineffective by reason of the sub-

stantial representation of the City of Philadelphia in the management of the Association. Specifically, does a potential 50% degree of control of the governing board of the Association by the City serve automatically to deprive the indigent client of competent, disinterested counsel?

The Defender Association, a nonprofit corporation in existence since 1934, applied to the court below in 1969 for approval of certain amendments to its Articles of Incorporation. The Non-Profit Corporation Law[1] provides that the court of common pleas shall approve amendments to the charter of such corporations if in the court's opinion they are "lawful, will be beneficial and not injurious to the community." Objections interposed by appellants and others were heard and considered, whereupon the court of common pleas entered its order approving the amendments.[2] On appeal the Superior Court affirmed, per curiam, without opinion, two judges dissenting.[3] *Defender Association of Philadelphia Amendments of Articles of Incorporation,* 219 Pa. Superior Ct. 309, 279 A. 2d 240 (1971). We granted allocatur because of the importance of the question involved, and now affirm.[4]

---

[1] Act of April 29, 1874, P. L. 73, §42, as amended, 15 P.S. §7707.

[2] Appellants Segal and Schwartz are both members of the appellee Association who voiced their opposition to the proposed amendments at the appropriate meetings of the Association. Mr. Schwartz had been also a director of the Association, but resigned from that position because of the matters here in controversy. In the hearings below the appellants represented themselves and certain other objectors to the proposed amendments.

[3] Judge SPAULDING filed a dissenting opinion, in which Judge HOFFMAN joined.

[4] Appellate scope of review in an appeal from an order approving articles of amendment of a nonprofit corporation is properly limited to whether or not the lower court committed an error of law or a serious abuse of discretion. See *Nottingham Fire Co. Charter Case,* 394 Pa. 631, 632, 149 A. 2d 119 (1959) ; *In re Elkland Leather Workers' Association, Inc.,* 330 Pa. 78, 198 A. 13 (1938).

The facts as found by Judge McDevitt in his adjudication are not disputed. They may be summarized as follows: From the time of its incorporation in 1934 until the mid-nineteen sixties, the Association had been purely private in character, deriving its funds from membership dues and contributions from individuals and charitable organizations such as the Community Chest and the United Fund. Until the revolution in the field of constitutional law relating to criminal procedure which began in the early part of the last decade, the Association could function adequately with the moneys so received. Commencing with the historic decision of the Supreme Court of the United States in *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799 (1963), however, the scope of judicially mandated representation of the poor increased dramatically.[5] The

---

[5] Other decisions of the Supreme Court extending the rights to counsel include *Argersinger v. Hamlin*, 407 U.S. 25, 32 L. Ed. 2d 530 (1972) (extending the Sixth Amendment right to counsel to defendants in any criminal case where imprisonment for any term could be imposed); *Coleman v. Alabama*, 399 U.S. 1, 26 L. Ed. 2d 387 (1970) (defendants entitled to counsel at preliminary hearings); *Mempa v. Rhay*, 389 U.S. 128, 19 L. Ed. 2d 336 (1969) (holding revocation of probation and imposition of sentence to be a critical stage requiring assistance of counsel); *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527 (1967) (juveniles in delinquency proceedings held constitutionally entitled to representation of counsel); *Douglas v. California*, 372 U.S. 353, 9 L. Ed. 2d 811 (1963) (counsel must be provided for any indigent defendant on the first appeal from a conviction allowed as a matter of right). Cf. *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178 (1967); *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966); *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977 (1964).

Our own Court has been diligent to protect the right to counsel at various stages of the criminal process. See, e.g., *Commonwealth ex rel. Rambeau v. Rundle*, 455 Pa. 8, 314 A. 2d 842 (1973); *Commonwealth v. Sheehan*, 446 Pa. 35, 285 A. 2d 465 (1971); *Commonwealth v. Tinson*, 433 Pa. 328, 249 A. 2d 549 (1969); *Commonwealth ex rel. Firmstone v. Myers*, 431 Pa. 628, 246

Association therefore sought other sources of funding in order to continue to provide quality defense services to the increasing number of indigents entitled to them. Initially the Association was successful in obtaining significant financial assistance through grants from the Ford Foundation, the National Defender Project of the National Legal Aid and Defender Association, the United States Office of Economic Opportunity (OEO) and voluntary contributions of the City of Philadelphia. Thus, by 1967, the combined budget for Association operations, including representation of juveniles, had risen to $600,000; of this amount $152,000 came from the City.

In 1968 the still increasing need for legal defense services and the termination of contributions previously received for limited time periods from the Ford Foundation, OEO and the National Defender Project combined to create a financial crisis for the Association. An effort to obtain additional funds from the City was unsuccessful, and the Association was compelled to plan for a reduction of services. Contemporaneously, in November of 1968, a bill was introduced in City Council proposing the creation of a wholly new public defender program unrelated to that of the Association, the chief administrative officer of which would be appointed by the Mayor of the City of Philadelphia. The bill met immediate opposition from the Association and from many other groups in the community who were satisfied that throughout its existence the Association had provided indigent citizens

---

A. 2d 371 (1968) ; *Commonwealth v. Sliva*, 415 Pa. 537, 204 A. 2d 455 (1964) ; *Commonwealth ex rel. Remeriez v. Maroney*, 415 Pa. 534, 204 A. 2d 450 (1964) : *Commonwealth ex rel. O'Lock v. Rundle*, 415 Pa. 515, 204 A. 2d 439 (1964). A review of federal and state decisions following *Gideon* is contained in Comment, Right to Counsel ; Impact of *Gideon v. Wainwright* in the Fifty States, 3 Creighton L. Rev. 103 (1970).

with independent legal defense services of the highest quality. There followed meetings between representatives of the Association and the City to search for a compromise approach which would enable the Association to continue to provide all of the constitutionally required legal defense services in Philadelphia. These negotiations resulted in a contract between the Association and the City, entered into on January 28, 1969.

The contract was approved by a majority (19 to 16) of the Board of Directors of the Association. It provides that the Association shall provide counsel and necessary investigative and other services to indigents in various areas of representation,[6] and that the City shall compensate the Association in amounts to be appropriated by City Council from time to time.[7] The Board of Directors of the Association is to be reduced in number from 50 to 30 members, 10 directors to be chosen by the Mayor of the City of Philadelphia with the approval of City Council, ten to be chosen by the members of the Association, and the remaining ten directors (called "community directors") to be chosen by agreement among a majority of the City Directors and a majority of the Association directors. Under the contract the Board of Directors appoints the Chief Defend-

---

[6] The contract identified the following types of proceedings wherein the Association's services would be supplied:

(1) Juvenile delinquency;
(2) Any indictable offense at any stage of the prosecution;
(3) Any offense cognizable before the Municipal Court;
(4) Post-conviction proceedings;
(5) Habeas corpus proceedings;
(6) Extradition proceedings;
(7) Probation and parole proceedings; and
(8) Appeals.

[7] For the fiscal year 1969-70 the Association budgeted $1,263,595 to provide the representation called for by the contract, of which amount it was agreed that the City would provide $1,160,095 (about 92% of the budget).

er and the First Assistant Defender; the Chief Defender appoints such other professional and non-professional staff as may be necessary.[8]

As a result of the agreement between the City and the Association, the public defender bill then pending in City Council was not acted upon. It was to effectuate the contractual provisions pertaining to changes in its organizational structure that the Association undertook to amend its Articles of Incorporation, for that purpose seeking the necessary approval of the court of common pleas.

There is no dispute that any plan to provide counsel to persons who need representation in criminal proceedings should be designed to provide counsel who is both competent and independent. "The plan and the lawyers serving under it should be free from political interference." A.B.A. Project on Providing Defense Services §1.4, at 19 (Approved Draft, 1968). The integrity of the relationship between lawyer and client,

[8] The agreement also contains the following additional provisions:

(1) The Chief Defender shall be a lawyer in active practice before the courts of record of the County of Philadelphia with at least five (5) years' experience in the active practice of law.

(2) All employees shall be full-time except with the approval of two-thirds of all members of the Board.

(3) The term of the contract shall be perpetual; provided, however, that either party may terminate it on June 30th of any calendar year provided not less than ninety days written notice of such termination is given. In addition, the Association is authorized to terminate the agreement upon thirty days written notice "[i]n the event that the Association shall determine that any such appropriation by the City [to compensate the Association for its services under the agreement] is insufficient."

(4) The City shall have the right to audit the books and records of the Association. For this purpose such books and records shall be made available to representatives of the Finance Director of the City and the City Controller at such reasonable times as are required by any such representative.

requiring among other things complete fidelity to the client's interest, should be preserved inviolate. Like any lawyer, a person chosen to represent an accused indigent person may serve but one master—the client. Independence of any plan to provide such services can be assured "if and only if the system is properly insulated from pressures, whether they flow from an excess of benevolence or from less noble motivations." *Id.* §1.4, at 20 (Comment).[9] The question presented by the case before us is whether the Association, as it will be reorganized pursuant to the contract with the City, will be able to render defender services which measure up to these standards. We hold that the court of common pleas committed no error of law or abuse of discretion in finding that on this record the question should be answered affirmatively.

In essence, appellants' objections to the amendments are that the appointment of one-third of the Association's directors by the Mayor ("City directors") and the selection by those directors and the "Association directors" of the final one-third of the Board ("community directors") in effect gives the City 50% representation and thus potentially effective control of the Association. This in turn, it is said, will adversely affect the independence of Association attorneys and thus create an unconstitutional conflict of interest. It therefore follows, so appellants argue, that the amendments are neither "lawful, beneficial or non-injurious to the community" as required by statute. The conflict of interest is found in the fact that the Mayor appoints both the Commissioner of Police and the City Solicitor,

---

[9] See also *Equal Justice for the Accused* 61, 71, 74-76 (Report of a Special Committee of the Association of the Bar of the City of New York and The National Legal Aid and Defender Association, 1959).

a prosecuting official,[10] whose interests as law enforcement officers are presumed to be antithetical to those of criminal defendants. We are unable to agree.

We are of course well aware of the line of conflict of interest cases to which appellants refer us and which declare that "the potentiality that [actual] harm *may* result, rather than that such harm *did* result will require reversal." *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 48, 176 A. 2d 641 (1962) (emphasis in original). See also *Commonwealth v. Wilson,* 429 Pa. 458, 240 A. 2d 498 (1968) ; *Commonwealth v. Werner,* 217 Pa. Superior Ct. 49, 268 A. 2d 195 (1970) ; *Commonwealth v. Bostick,* 215 Pa. Superior Ct. 488, 258 A. 2d 872 (1969). These and other similar cases invariably involve direct conflicts that arose in situations in which defense counsel undertook to represent codefendants with differing interests.[11] In the case before us, however, the potentiality of conflict of interest is not direct, but is attenuated and speculative at best, as examination of the proposed new organizational structure shows.

The Mayor appoints one-third of the members of the Association's Board of Directors. Even should each of these City directors be obliged to follow, for political or other reasons, the dictates of the Mayor in exercising his or her vote as a member of the Board, this would not give the Mayor or the City control of the Associa-

[10] The City Solicitor acts as a prosecutor in cases involving violations of some criminal ordinances (e.g., anti-weapon ordinances) and also in cases of violation of mayoralty proclamations.

[11] See A.B.A. Special Committee on Evaluation of Ethical Standards, Code of Professional Responsibility, Disciplinary Rules 5-105, 5-107(A), (B) (Final Draft, 1969) ; A.B.A. Project on Standards for Criminal Justice, Standards Relating to the Defense Function §3.5(b) (Tent. Draft, 1970).

tion.[12] It is appellants' theory, however, that the manner of selecting the community directors envisaged by the charter amendments, viz., by agreement of a majority of the City and Association directors, would effectively raise city representation to 50%. This argument assumes, of course, that the City group and the Association group each will select one-half of the community directors and that each group will automatically accept the nominations of the other. It also assumes that those community directors will themselves be the creatures of the group which nominated them. All this is sheer speculation. We have no reason to believe that the Association directors, at least one of whose votes is necessary for majority action, would be unaware of the obvious harm that would result from the injection of improper influence into the operation of the Association and would accept nominees for community director seats on the Board if there were any indication that such nominee would act merely as a rubber stamp for the Mayor. We think it much more likely that both the Association directors and the City directors would make and approve nominations of persons whose character, background and experience suggest qualification for the task of board membership independent of any political predilections.

Appellants argue that, in the same way that effective control of a business corporation can be had with ownership of less than 50% of the outstanding shares,[13] so here it would be possible for the City to control the Association even though the City could dictate the

---

[12] While appellants assume that the City directors would act in concert on all matters, there is no evidence whatever in the record that this would necessarily be so.

[13] See generally L. Loss, Securities Regulation 770 (2d ed. 1961) ; Berle, "Control" in Corporate Law, 58 Col. L. Rev. 1212 (1958).

votes of something less than 50% of the Board of Directors. The analogy is inapposite here where we are not dealing with a business corporation controlled through stock ownership. The arithmetic of control involved in the present case is simple indeed: In making a decision on behalf of the Association, thirty votes may be cast by the Board of Directors; each member of the Board has one vote; the ten votes of the City directors, assuming they would vote in a bloc, would obviously not constitute a majority and would not constitute control of the Association.[14]

Furthermore, the bylaws of the Association contain safeguards against the creation of an impermissible conflict of interest. The Board of Directors must select the Chief Defender and the First Assistant Defender *by majority vote*.[15] The Chief Defender, in turn, has the power to appoint the Association's professional, in-

---

[14] Cf. *United States v. Union Pacific R.R. Co.*, 226 U.S. 61, 95, 96 (1912), wherein the Court recognizes that although a large corporation with many shareholders can effectively be controlled through united ownership of less than 50% of the stock, a small corporation cannot normally be controlled through ownership of less than a majority of outstanding stock. See also H. Oleck, Non-Profit Corporations, Organizations, and Associations (2d ed. 1965) ("In a non-profit corporation [a control] agreement is rather futile . . . since each member ordinarily has only one vote, an agreement of this kind would have no real effectiveness unless it included a majority of the members." See generally, Hornstein, Stockholders' Agreements in The Closely Held Corporation, 59 Yale L.J. 1040 (1950); F. H. O'Neal, Close Corporations (1970).

[15] Judge McDEVITT, in his thorough and careful adjudication, stated that it was his belief "that the Chief Defender and his assistants should have the protection of 'tenure' in office . . . Anything less will be a clear indication that the defender organization is suspect. The Association must offer lawyers career service opportunity." We agree. Later in his discussion, the hearing judge observed that "[f]or the first time the Association will be in a position to offer prospective members of the defender staff a competitive and adequate salary or rate of compensation and hopefully a career."

vestigative, and clerical staff. Unless two-thirds of the Board approve, every Association employee must be full-time.[16] No employee of the Association is permitted to be a candidate for public office, a member of any committee of a political party, a member of a committee of a partisan political club, or to take part in the management or affairs of any political party or any political campaign.

In sum, then, the assumed attitude of antagonism to criminal defendants which lies at the base of the conflict of interest charge must be transmitted from the Mayor and City Council to a majority of the Association's Board of Directors, and thence from the Board to the Chief Defender. According to appellants' scenario, the Chief Defender, acting for or under the influence of the Mayor and the Board, would make decisions and influence staff attorneys to violate the standards of professional conduct by acting in a manner contrary to the best interests of their clients. As the court of common pleas found, the record is devoid of any concrete facts to support this hypothesis.

In contrast, there is ample evidence in the record to sustain the lower court's conclusion that the Defender's office under the new structure will not be infected *ab initio* with a built-in conflict of interest.[17] It was found as a fact that in recent years a number of public

---

[16] The "full-time" employment requirement for Association staff is an obvious recognition of the necessity for employee independence. The City's acceptance of this arrangement would seem to be an indication of its good faith.

[17] We note in passing that the record reveals that the amended articles of incorporation met with the approval of both the United Fund of Philadelphia, a large contributor to the Association, and the Board of Governors of the Philadelphia Bar Association. Each organization indicated that it believed that the amendments would be beneficial and would not adversely affect the independence of the Association.

defender systems have been established in which management was placed in a board of directors containing, as here, substantial representation from both the public and private sector.[18] Such "public-private" defender systems have been able to maintain their independence. Within the classification of public defender systems are also included several other organizational forms. Among these are the assigned counsel system,[19] where generally counsel is appointed by the courts, a strictly public program headed by a public official and supported by public funds,[20] and private defenders who are financed only by private donations. We recognize that a conflict of interest may conceivably arise in any of these programs. It is impossible to insure in advance against all form of influence which might bear adversely on the quality and the independence of the defender services.

We believe that the lower court did not abuse its discretion in holding that the organizational structure of the Philadelphia Association provides adequate safeguards to protect its independence. By today's affirmance we do not suggest that this structure thus approved is necessarily the form of organization that will best withstand improper pressure; we hold merely that there is sufficient evidence in the record to sustain the lower court's finding that the articles of incorporation,

---

[18] See generally Equal Justice for the Accused (Report of a Special Committee of the Association of the Bar of the City of New York and The National Legal Aid and Defender Association, 1959); A.B.A. Project on Standards for Criminal Justice, Standards Relating to Providing Defense Services (Approved Draft, 1968); Silverstein, Defense of the Poor in Criminal Cases in American State Courts (1965); National Defender Project, Handbook, How to Organize a Defender Office (1967).

[19] See, e.g., Alaska Rules Crim. Prac. 39; Ky. Rev. Stat. Ann. §453.190 (1963); W. Va. Code 62-3-1(a) (1966).

[20] See, e.g., Conn. Gen. Stat. Ann. §§54-81a, 54-80 (Supp. 1965); Minn. Stat. Ann. §611.12 (1964).

as amended, comport with the requirements of the Non-Profit Corporation Law.[21]

Order affirmed.

----

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I dissent from the majority's holding that the instant amendments to the Philadelphia Defender Association's articles of incorporation are "lawful", "beneficial" and "non-injurious to the community." In my view, the changes are distinctly to the contrary, and therefore do not comply with the Non-Profit Corporations Act, Act of April 29, 1874, P. L. 73, §42, as amended, 15 P.S. §7707. The amendments approved by the majority will undoubtedly destroy the necessary independence and non-political character of the Association. In turn, the challenged amendments create the inherent possibility of an unconstitutional conflict of interest, or at best, the equally objectionable appearance of such conflict.

Despite the majority's repeated assertions that the Mayor of Philadelphia will name only one-third of the Association's directors, the proposed amendments to the Defender Association's charter give the Mayor far more than this. He can now *directly* appoint one-third of the Board (10), and *indirectly* (through his ten appointees) appoint another one-sixth (5), for a total of one-half (15) of the Board (of 30). This appointing power of the Mayor, coupled with *control of the funds* and the

----

[21] Our holding in no way precludes the possibility of judicial relief in future if the occasion should arise. As only one example, should it appear that pressure has been brought to bear on Association attorneys to persuade their clients to forego jury trials or appeals in order to avoid the cost to the City that they entail, a clear case of unconstitutional conflict of interest would be made out, not to speak of violations of the standards of professional responsibility. Evidence of improper influence or pressure, whether overt or covert, will trigger an appropriate judicial response.

power to terminate the contract on June 30 of any year, vests in the Mayor clear and realistic working control of the Defender Association.[1] The Board, effectively under the control of the Mayor, appoints the Defender, who is to serve, with his assistants, without a fixed tenure[2] and at the will of the appointing authority.

The Mayor, however, also controls the appointment of the Police Commissioner and the City Solicitor. Section 3-206 of the Philadelphia Home Rule Charter requires that the Mayor approve the appointment of the Police Commissioner; the annotation to that section notes "[t]he Mayor has a voice in the appointment process because the ultimate responsibility of City administration is his."

Section 3-203 of the Home Rule Charter gives the Mayor the responsibility of appointing the City Solicitor, one of whose functions is to investigate, "[w]ith the approval of the Mayor, . . . any violation or alleged violation within the City of the statutes of the Commonwealth of Pennsylvania or the ordinances of the City" and to "take such steps and adopt such means as may be reasonably necessary to enforce within the City such statutes and ordinances." Home Rule Charter §4-400 (d). The annotation states that while it "is not intended to transfer to the Law Department the traditional powers of the office of the District Attorney, . . . it does empower the Law Department . . . to act in the law enforcement field." See generally *Specter v. Bauer*, 437 Pa. 37, 261 A. 2d 573 (1970). Indeed, this re-

---

[1] For less than 50%, and in the absence of funding, see also Public Utility Holding Company Act of 1935, §2, 15 U.S.C.A. §79b(a) (8) (10% ownership of voting securities is presumptive control); Investment Company Act, 15 U.S.C.A. §80a-2(a)(9) (25% is tantamount to control); see generally 2 Loss, Securities Regulation 770 (2d ed. 1961).

[2] See footnote 6 infra, and the accompanying text.

siduum of authority has been used to bring prosecutions. See, e.g., *Commonwealth v. Stotland*, 214 Pa. Superior Ct. 35, 251 A. 2d 701 (1969).

This governmental structure, whereby the Mayor not only appoints the Police Commissioner and City Solicitor, but also substantially controls the appointment of the Defender, raises serious questions as to the practical and working ability of the Defender Association to give undivided loyalty to those it represents. Certainly present is the real possibility that the Defender may be forced, or appear to be forced, to accommodate interests (of the Police Commissioner, City Solicitor, and perhaps ultimately the Mayor) which may be in direct conflict with the defense interests of those accused of crime. Since the City Solicitor and the Police Commissioner, and now, under the majority opinion, the Defender, are accountable to the same official— the Mayor—". . . *might not a defendant with reason say that he feared he could not get a fair trial?*" *Tumey v. Ohio*, 273 U.S. 510, 533, 47 S. Ct. 437, 445 (1927) (emphasis added).

## I

The petition to amend the Defender Association's articles of incorporation, brought under the Non-Profit Corporation Act, Act of April 29, 1874, P. L. 73, §42, 15 P.S. §7707, to succeed, must show that the proposed changes are "*lawful . . . beneficial and non-injurious to the community.*" (emphasis added.) Section 7707 of the Act requires the proponents of an amendment to show *affirmatively* that the changes are both "beneficial" and "non-injurious to the community." The Legislature mandated that no amendment be allowed *unless* it improved or enhanced the organization's service to the community. Totally absent on this record is any such showing.

Despite the clear legislative directive for an affirmative finding of benefit, the trial court, without such a ruling nevertheless permitted the amendments. There was absolutely no showing that the Association's new structure, which gives the City 50% of the Board's membership and control, would be, in any sense, an improvement over the previously wholly independent and apolitical Defender Association. All that the proponents showed was that the City's funds were needed by the Association and that the City would not make funding available without naming one-half of the Board membership. Important as funds are for the continuation of the Association, funding is not the issue—the issue is and was whether the amendments (giving control to the Mayor) were "beneficial" and "non-injurious to the community." 15 P.S. §7707, supra. On this issue the majority is in supreme error.

Since no adequate proof was offered by the proponents on this issue (in fact, all of the testimony offered was to the contrary), the amendments should be disallowed. That controlling and uncontradicted testimony is set out in pertinent part in Judge SPAULDING's dissenting opinion in *Defender Association of Philadelphia Amendments of Articles of Incorporation*, 219 Pa. Superior Ct. 309, 313-21, 279 A. 2d 240, 241-46 (1971) (dissenting opinion, joined by HOFFMAN, J.).

## II

Moreover, the amendments are impermissible for the more basic reason that they are not "lawful", 15 P.S. §7707, supra, since allowing control to pass to the Mayor creates the inherent possibility of an unconstitutional conflict of interest, or at the least, the appearance of impropriety.

Until today, this Court has been most vigilant in guarding against the possibility that defense counsel

with a conflict of interest will harm his client's cause. We have heretofore held that ". . . *the mere existence of such a conflict vitiates the proceedings, even though no actual harm results. The potentiality that such harm may result, rather than that such harm did result, furnishes the appropriate criterion.* . . . The rule is not intended to be remedial of actual wrong, *but preventative of the possibility of it.*" *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 48, 176 A. 2d 641, 643 (1962) (emphasis added). Accord, *Commonwealth v. Wilson,* 429 Pa. 458, 240 A. 2d 498 (1968). Our focus on the "possibility" of harm is in recognition of the fact that it is often difficult to determine, with hindsight, exactly where and how the conflict of interest harmed the client.

It may be that counsel was "effective" (*Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A. 2d 349 (1967)), but could have been more effective had he not been burdened with the conflict. See *Whitling,* supra at 49, 176 A. 2d at 643; cf. Comment, "Conflict of Interests: Multiple Defendants Represented By A Single Court-Appointed Counsel," 74 Dick. L. Rev. 241, 249 (1970). However, effectiveness of counsel is not the test to be applied when dealing with counsel confronted with a conflict of interest, or the appearance of one. In such cases we have not deprived the defendant of his liberty, since the right to effective assistance of counsel (*Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792 (1963)) ". . . *is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.*" *Glasser v. United States,* 315 U.S. 60, 76, 62 S. Ct. 457, 467 (1942) (emphasis added). "*It is unchallenged that the Sixth Amendment guarantee of effective assistance requires the service of a lawyer who is not obligated to serve conflicting interests at the same time. . . .*" *Com-*

monwealth ex rel. Gallagher v. Rundle, 423 Pa. 356, 359, 223 A. 2d 736, 737 (1966) (emphasis added).

This Court has also heretofore wisely been concerned with the possibility, inherent in a conflict of interest situation, of an appearance of harm. Courts have long been of the view that ". . . justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954) (FRANKFURTER, J.). Indeed, it is of vital importance that our system of criminal justice convey to defendants the belief that they are being dealt with fairly. So too, "[t]he public must be satisfied that fairness dominates the administration of justice." Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S. Ct. 236, 241 (1942).

In Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437 (1927), the United States Supreme Court held violative of due process a system for trying prohibition cases in which the mayor, as judge, imposed fines on behalf of the village, and kept the "costs" as his compensation. The Court emphatically refused to look into whether the defendant, in fact, had been harmed by this procedure. Id. at 535, 47 S. Ct. at 445. Rather, the Court stated: "With his interest, as mayor, in the financial condition of the village, and his responsibility therefor, might not defendant with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine?" Id. at 533, 47 S. Ct. at 445 (emphasis added). More than three decades later the Court reaffirmed this view in Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 59, 93 S. Ct. 80, 83 (1972). The similarity between Tumey, supra, and Ward, supra, and the facts presented by the instant case is strikingly clear. The sense of justice and fairness expressed in Tumey and Ward controls here as well and requires similar treatment.

Certainly, an advocate who is free to pursue his client's interests is as essential an ingredient in the appearance of justice as is the impartial judge. Cf. *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967); *Gideon, supra; Commonwealth v. Jones*, 451 Pa. 69, 301 A. 2d 811 (1973); *Commonwealth v. Fletcher*, (Pa., filed May 4, 1973, reargument granted July 23, 1973) (ROBERTS, J., dissenting). As the United States Court of Appeals for the District of Columbia stated in *Suggs v. United States*, 391 F. 2d 971, 974 (D.C. Cir. 1968); "It is of importance in the interest of justice that the final judgment against an indigent should not be compromised by the possibility that a different result would have ensued if only he had the resources to retain his own lawyer instead of being required to accept counsel selected by the court. *Much depends on a system that avoids suspicion of such compromise, for reasons that include awareness that where there is a basis for such suspicion prospects of rehabilitation are stifled. Justice must not only be done, it must appear to be done . . . . It is one thing for a prisoner to be told that appointed counsel sees no way to help him, and quite another for him to feel sandbagged when the counsel appointed by one arm of the Government seems to be helping another to seal his doom. . . .* [T]he courts must do what can reasonably be done to leave indigent prisoners with the impression that they have been dealt with fairly." (emphasis added.)

In our adversary system of justice a defendant ". . . requires the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 64 (1932). See *Argersinger v. Hamlin*, 407 U.S. 25, 92 S. Ct. 2006 (1972). The defendant must be convinced that the "guiding hand" acts *only* in his interest, unhindered by any divided loyalty. See *McKenna v. Ellis*, 280 F. 2d 592 (5th Cir.

1961) (holding that representation of a defendant by two attorneys who were candidates for jobs with the district attorney improper; accordingly, the judgment of sentence was reversed). As the Fifth Circuit said in *McKenna,* supra: *"We interpret the right to counsel as the right to effective counsel.* We interpret counsel to mean not errorless counsel, and not judged ineffective by hindsight, *but counsel reasonably likely to render and rendering reasonably effective assistance. We consider undivided loyalty of appointed counsel to client as essential to due process."* 280 F. 2d at 599 (emphasis added).

A defense lawyer who has conflicting interests can hardly give the necessary appearance of undivided loyalty, regardless of how effective he may be in reality. *"[T]he indigent defendant is entitled to a lawyer who can give to his client undivided loyalty and faithful service. A lawyer forced, or attempting, to serve masters with conflicting interests cannot give to either the loyalty each deserves."* *Goodson v. Peyton,* 351 F. 2d 905, 908 (4th Cir. 1965) (emphasis added).

So too must be the case here, where public defenders, appointed and continued in office in large part by City Hall and *possibly appearing* to be controlled thereby, will conceivably be reluctant to provide the representation demanded by the Sixth Amendment. Clearly, the accused, while being represented by the Defender Association, may not feel ". . . that they have been dealt with fairly." *Suggs,* supra at 974.

Although the American Bar Association's Code of Professional Responsibility warns against the very conflicts inherent in the proposed "partnership" between City Hall and the Defender Association, the majority, paying no heed to the sound advice of this prestigious body, sanctions the inevitable appearance of impropriety.

"EC 5-21 The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. *The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence.* A lawyer subjected to outside pressures should make full disclosure of them to his client; and if he or his client believes that the effectiveness of his representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client.

"EC 5-22 Economic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client and his professional work is exclusively with his client. *On the other hand, if a lawyer is compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client.*

"EC 5-23 *A person or organization that pays or furnishes lawyers to represent others possess a potential power to exert strong pressures against the independent judgment of those lawyers. Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client.* Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client. On some occasions, decisions on priority of work may be made by the employer rather than the lawyer with the result that prosecution of work already undertaken for clients is postponed to their detriment. Simi-

larly, an employer may seek, consciously or unconsciously, to further its own economic interests through the actions of the lawyers employed by it. *Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.*" American Bar Association Special Committee on Evaluation Of Ethical Standards, Code of Professional Responsibility, EC 5-21- EC 5-23 (Final Draft, 1969) (emphasis added) (footnotes omitted).

Not only does the Code of Professional Responsibility warn against "diluted" or "divided" loyalty, it also requires that a client be given an "*. . . opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires.*" Code, supra EC 5-16 (emphasis added).

Here, even after full disclosure of the possible conflict of interest, the indigent defendant has *no* effective alternative but to accept the representation of the Defender Association. Such a conflict, which surely would not be tolerated by a non-indigent defendant, will be unavoidable and undoubtedly acquiesced in by the indigent, having no other recourse. Such differing standards, depending on wealth, when dealing with the fundamental right to counsel, are prohibited by the Constitution. Cf. *Gideon v. Wainwright,* supra; *Douglas v. California,* 372 U.S. 353, 83 S. Ct. 814 (1963); *Griffin v. Illinois,* 351 U.S. 12, 76 S. Ct. 585 (1956).

### III

The majority asserts that the potential conflict of interest will not materialize because vigilant watchdogs, like the losing parties here, will act to insure the Defender's independence. Further, the majority offers

the additional suggestion that if improper political pressure is brought to bear on the Defender Association, "an appropriate judicial response" will be forthcoming. Such non-decisional assertions are absolutely nothing more than sheer speculation—one does not and should not structure an organization to provide defense services burdened at its start with the inherent possibility of a conflict of interest and then hope that somehow outside forces and perhaps the courts will neutralize the threat. Here, the "appearance of impropriety" condemned by the ABA Code of Professional Responsibility, supra at EC 9-6, is ignored by the majority.

Can the community which the Defender Association serves and the indigents it defends have confidence and trust in an Association significantly controllable by the Mayor, who also appoints the Police Commissioner and City Solicitor whose interests are obviously those of the prosecution and antithetical to the defense? This potential conflict is even made more egregious by the reality of this record which reflects that the City Solicitor, appointed by the Mayor, has, in fact, also been appointed, by the Mayor, to serve as a Director of the Defender Association.[3] The majority frames the possible conflict of interest as "speculative." Here, however, there is nothing "speculative" about the *appearance* of divided loyalty and the possibility that harm may result. The appearance of conflict is undeniable, where the Philadelphia Home Rule Charter gives the Mayor responsibilities inconsistent with exercising power over an independent Defender Association.[4]

---

[3] The City Solicitor was appointed to the Board on January 20, 1970.

[4] Other obvious conflicts exist between the Mayor and the Defender Association. As the record amply demonstrates, it was uncontradicted that prior to any negotiations (and as a condition

In view of these facts, an indigent defendant, being represented by the Defender Association, may well assume, regardless of the actual merits of a particular course of conduct chosen by the Defender, that he is being "sandbagged" because ". . . counsel appointed by one arm of the Government . . . [may seem] to be helping another to seal his doom." *Suggs*, supra. In such circumstances, justice will not "appear to be done." *Suggs*, supra. "For many of our citizens, legal services has reaffirmed faith in our government of laws. However, if we are to preserve the strength of the program, *we must make it immune to political pressures* and

---

precedent thereto) with the Association, the Mayor insisted that the Acting Defender, Martin Vinikoor resign. This demanded resignation, proved by the opponents and unrefuted by petitioners, was politically motivated, as Vinikoor had run for City Council, in the preceding campaign, on a ticket opposing the Mayor.

The record also discloses that on June 10, 1969 (at this time, the Defender Association was being primarily privately funded, in substantial part, by the United Fund) the Philadelphia Bulletin reported (on page 1) Police Commissioner (now Mayor) Rizzo's statement that he intended to stop police payroll deductions for the United Fund, since the United Fund also supported the Legal Aid Society. Commissioner Rizzo emphatically stated that organizations that "fight the Police Department . . . won't get a penny." The Philadelphia Bar Association, on June 16, 1969, roundly deplored, by resolution, the Commissioner's threat.

The Philadelphia Bulletin on August 27, 1969 (page 42) and on August 29, 1969 (page 1), under the headline "Rizzo Sets Up Meeting With Judge Carroll", reported a meeting, in Mayor Rizzo's office, attended by the District Attorney, the Commissioner of Police, the Mayor and several judges (including President Judge CARROLL), at which the judges were pressed to change their "lenient" sentencing policies. (These events, although included in the opponents' brief, are not of record as they transpired after the hearing in the trial court).

The above events can hardly be viewed by the community and indigent defendants as an assurance that the City will in no way attempt to influence the criminal defense of those unable to retain private counsel.

make it a permanent part of our system of justice." Message of The President (on the Legal Services Corporation Act) To Congress, Cong. Rec., S6212 (May 5, 1971) (emphasis added).

## IV

The only attempted justification for the challenged amendments advanced by the proponents is that 50% mayoral control is necessary to insure that the funds allocated by the City are properly expended. In essence, the argument advanced by petitioners, and accepted by the majority, is that since the City pays (as it is required to, *Argersinger,* supra; *In Re Gault,* 387 U.S. 1, 87 S. Ct. 1248 (1967); *Gideon,* supra) it is entitled to and must of necessity exercise control. Despite the fact that the City is obligated to insure that its funds are properly spent, its involvement here is far in excess of that required to meet this task. Cf. *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A. 2d 193 (1971) (involving more than $18,000,000 in Philadelphia funds).[5]

Uncontradicted testimony, including testimony of petitioners' witnesses (most importantly, that of the Court Administrator) undeniably established that the amount of control demanded by and granted to the City exceeds any legitimate budgetary interests. As the Court Administrator made clear, ". . . existing procedure through which his office channeled funds to the

---

[5] In *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A. 2d 193 (1971), where this Court ordered the City of Philadelphia to appropriate approximately $2,500,000 in additional funds to the Philadelphia Court of Common Pleas (in addition to approximately $16,000,000 already appropriated) for fiscal year 1970, the City at no time even suggested the need for any controls in any sense similar to those here approved by the majority. Obviously the usual government audits were sufficient there, as they are here, to maintain fiscal integrity. There has been no suggestion to the contrary.

Association was neither inefficient nor a burden upon that office." *Defender Association of Philadelphia Amendments of Articles of Incorporation, supra* at 314, 279 A. 2d at 242 (SPAULDING, J., dissenting). Unrefuted testimony made clear that the City's legitimate concerns could be accommodated through contractual covenants regarding the service to be performed, audits and other fiscal supervision, plus an invitation for any interested official to attend directors' meetings. The record also shows that in the more than 38 years that the Association has been in operation, full information has always been made available—no public official or responsible community agency has ever claimed otherwise.

Here, where the fundamental right to counsel (counsel free from the appearance of a conflict of interest) exists, the City's action must be viewed as an "overly broad" restraint on an indigent defendant's Sixth Amendment right to *independent* representation. Cf. *Gideon, supra; Goodson v. Peyton, supra.* The "chilling effect" (on confidence in the Defender's undivided loyalty to his client) produced by the City's significant power of control of the Association may be substantial. Cf. *NAACP v. Button,* 371 U.S. 415, 83 S. Ct. 328 (1963). Testimony by petitioners' own witnesses indicates that "less drastic" means could be utilized to insure fiscal integrity. Hence, the Defender's structure, today approved by the majority, is unconstitutional as an overly broad interference with indigent defendants' Sixth Amendment right to counsel. Cf. *Button, supra; Shelton v. Tucker,* 364 U.S. 479, 488, 81 S. Ct. 247, 252 (1960) ; *Cantwell v. Connecticut,* 310 U.S. 296, 60 S. Ct. 900 (1939). Although the City's monetary concerns are legitimate, these concerns ". . . cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

*Shelton,* supra at 488, 81 S. Ct. at 252 (footnote omitted).

## V

The majority's error, in my view, is compounded by its failure to give anything more than lip service to the American Bar Association Project On Minimum Standards For Criminal Justice, Standards Relating To Providing Defense Services (Approved Draft, 1968). These standards, as the title indicates, devised as *minimum* guides for providing criminal defense services to indigent defendants, are in direct conflict with the structure the majority today approves.

"The plan should be designed to guarantee the integrity of the relationship between lawyer and client. *The plan and the lawyers serving under it should be free from political influence and should be subject to judicial supervision only in the same manner and the same extent as are lawyers in private practice.* One means for assuring this independence, regardless of the type of system adopted, is to place the ultimate authority and responsibility for the operation of the plan in a board of trustees. . . ." Standards, supra §1.4 (emphasis added).

The Commentary to Section 1.4 provides: *"A system which does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can retain. Inequalities of this nature are seriously detrimental to the fulfillment of the goals of providing counsel. They are quickly perceived by those who are being provided representation and may encourage cynicism toward the justness of the legal system and, ultimately, of society itself.* Much of the dispute concerning the merits of various systems has centered

on their capacity to guarantee professional independence. . . . [T]he necessary independence [can] be guaranteed under any type of system, from public defender to assigned counsel, *if and only if the system is properly insulated from pressures, whether they flow from an excess of benevolence or from less noble motivations.* SEE EQUAL JUSTICE FOR THE ACCUSED 61, 67, 71, 74-75.

. . . .

"An independent governing board is the appropriate method of control of such a system, [public defender] EQUAL JUSTICE FOR THE ACCUSED 83-84.

*"Whatever the type of system employed, placing responsibility for its operation in a specially designated board outside the ordinary framework of state or local government will assist in guaranteeing sufficient independence and adequate supervision. It will also help to ensure that the task of providing counsel is not submerged in the welter of other problems of government.*

"Because the board would exercise general supervision over the policies and operations of an agency composed of lawyers performing professional work, *the board should be composed of lawyers.* SEE APPLICATION OF COMMUNITY ACTION FOR LEGAL SERVICES, INC., 26 APP. DIV. 2d 354, 274 N.Y.S. 2d 779, 787-88 (1966).

*"Prosecutors* and judges *should be excluded* from the membership of governing boards to remove any basis for an implication that defense attorneys under the system *are in any way subject to the control of those who appear as their adversaries or before whom they must appear . . . ."* (Emphasis added.)

Section 3.1 of the Standards, supra, states: "A defender plan should be designed to create a career service. *Selection of the chief defender and staff should be made on the basis of merit and should be free from political, racial, religious, ethnic and other considerations* extraneous to professional competence. *The tenure*

*of the defender and his staff should be protected similarly. . . ."* (emphasis added.)[6]

The Commentary to that Section (3.1) notes: "[T]here is widespread agreement that it is essential that a defender be free from political influence. The independence of the defender is fundamental to both the fact and the appearance of zealous representation of the accused. One of the chief recommendations of the Special Committee of the Association of the Bar of the City of New York and the National Legal Aid Association was that the *public defender should be appointed and given tenure 'in such a manner as to eliminate or minimize political and other influences which might affect his professional independence and his loyalty to his client.'* EQUAL JUSTICE FOR THE ACCUSED 31. See also *id.* at 92." (emphasis added.)

It is clear that the amendments sanctioned by the majority fail to adhere to either of the above noted standards.[7] Freedom from "political influence" quite patently does not mean the kind of "City Hall" control, approved by the majority. Further, the Mayor's refusal to deal with the then Defender Martin Vinikoor (see footnote 4, supra) can hardly be conceived of as an indication that the City's actions will be free from "political considerations." And finally, the City's refusal to provide the Defender and his assistants with tenure, is not only contrary to §3.1 of the Standards, supra, and other authorities noted in footnote 5, supra, but

---

[6] See also Uniform Law Commissioner's Model Defense Of Needy Persons Act, §10(a)(1) (Defender's term of office to be not less than six years) ; National Conference on Criminal Justice, Standard 13.8 (January 23, 1973) (Defender's term of office to be not less than four years).

[7] See also National Defender Project, Handbook On How To Organize A Defender Office (1967) (recommends providing ". . . a screen between the defender and 'City Hall' " and for minimizing ". . . the influences of partisan politics." (p. 31)).

also is assurance that one acting in conflict with the wishes of the Mayor can be removed at any time by the Board of Directors, a Board substantially controlled by the Mayor. (As noted above, the City Solicitor has been appointed to the Board of the Association, despite the recommendation of the Commentary to Section 1.4 of the Standards, supra.) No justification for this flagrant disregard of professional standards has been advanced by the majority, and indeed, none can be imagined.

## VI

From July 1, 1971, to June 30, 1972, the Defender Association disposed of 14,099 criminal cases in the courts of the City of Philadelphia. (Approximately 500 additional cases were handled by the Defender in the United States District Court.) Defender Association of Philadelphia, 38th Annual Report of The Directors 23 (1971-72). During a comparable period, January 1, 1972, through December 31, 1972, the Philadelphia Court of Common Pleas disposed of 21,727 criminal (including juvenile) cases. 1972 Annual Report of the Philadelphia Common Pleas & Municipal Courts 1. Assuming that the figures for these two twelve month periods are comparable, the Defender Association handles more than 63% of all criminal cases disposed of by the Philadelphia Court of Common Pleas. The Defender's monetary expenditure for the 1971-72 period was approximately $2,000,000; $1,500,000 represents the amount appropriated by the City. Defender Report, supra at 26-27.

As previously noted, the City of Philadelphia is obligated to provide free defense services for indigents accused of crime. *Argersinger,* supra; *In Re Gault,* supra; *Gideon,* supra. Accordingly, the City, *even absent the control now afforded it by the majority,* is consti-

tutionally required to allocate funds for the representation of indigent defendants. The City, having this affirmative duty, cannot escape it, even if the amendments (as they should be) were disallowed. As this Court made clear in *Commonwealth ex rel. Carroll v. Tate,* supra at 52, 274 A. 2d at 197, the judiciary possesses ". . . the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice. . . ." Clearly nothing could be more central to the administration of justice than counsel for the accused, and court appointed counsel where necessary. *Argersinger,* supra; *In Re Gault,* supra; *Gideon,* supra.

The majority, accordingly, has today given the City control in exchange for its contract to do that which it is legally obligated to do, that is, to provide funds for the representation of those defendants who are unable to pay. The losers in this transaction are unfortunately the citizens of Philadelphia who have lost the services of a heretofore wholly independent and non-politicized Defender Association.

## VII

It is inescapably clear that the majority has ignored the specific statutory language of the Non-Profit Corporations Act, supra, and approved amendments that are neither "lawful", "beneficial" nor "non-injurious to the community." 15 P.S. §7707, supra. Additionally, the majority has paid no heed to the strong public policy and constitutional considerations involved in keeping the Defender Association free from the spectre of external government and political pressures. Instead, it has gone in the opposite direction. The record makes clear to a firm and unquestioned certainty that the amendments diminish the ability of the Defender Asso-

ciation to perform its primary objective of independent representation for indigent defendants.

Today, the majority has given its aid to making the Association considerably less effective and less independent than it was prior to the amendments. This the majority has accomplished by compelling a "partnership" between the Defender Association and the Mayor of Philadelphia, a Mayor who at the same time is responsible for law enforcement under the Home Rule Charter. Hence, the Association cannot now be or appear to be professionally independent and "free from political influence."[8] Nor can it be free from the inherent possibility of a conflict of interest which may harm its clients. It is no longer a Defender Association calculated to insure that there will always be at least the "appearance of justice."

The majority's determination evokes earnest disagreement and compels strong dissent.

Mr. Justice MANDERINO joins in this dissenting opinion.

---

[8] "Nothing could now be clearer than that a professional legal services program [or defender association], one with which the bar can cooperate and support, *must have an independent, non-political base* rather than be part of an agency [or city government] whose outlook and direction change with political winds and fortunes." 59 American Bar Association Journal 523 (May, 1973) (emphasis added).